IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| *v.* | ) |
| | ) No. 1:17-cr-270-LMB |
| AHMED AMEER MINNI, and | ) |
| RAMY SAID ZAMZAM. | ) |
| | ) |
| | ) |
| *Defendants*. | ) |

# MEMORANDUM OF THE UNITED STATES MEMORIALIZING SENTENCING RECOMMENDATION

**I.   INTRODUCTION**

The government hereby submits this Memorandum Memorializing its Sentencing Recommendation for the sentencings of defendants Ahmed Ameer Minni and Ramy Said Zamzam, who were recently extradited to the United States after serving nearly 13 years in prison in Pakistan. For the reasons set forth herein, absent any violations of the law or release conditions and assuming full compliance with all requirements imposed by the Court and the Probation Office, the government intends to recommend a sentence of imprisonment of one day, with credit for the time served in the Alexandria Detention Center on or about September 7, 2022, followed by a term of supervised release of 20 years, which the parties have jointly agreed to recommend. The government further intends to recommend that this sentence, which is below the Guidelines Range, be imposed through a downward departure or variance, as deemed appropriate by this Court.

**II.   Factual Background**

The Statement of Facts filed with the plea agreements is based on the best current

1

information available to the government, subject to the information contained in the final Presentence Report. To summarize briefly, in November 2009, Ahmed Ameer Minni, Ramy Said Zamzam, Aman Hassan Yemer, Umar Farooq Chaudhry, and Waqar Hussain Khan traveled to Pakistan with the intent of joining in *jihad* on the front lines in Afghanistan. This conspiracy began in approximately May 2009 when Minni was first contacted by a recruiter by the name of "Saifullah" as a result of Minni's postings about *jihadist* videos on YouTube.[1] "Saifullah" encouraged Minni to travel to Pakistan to engage in violent *jihad*. Around the same time, Yemer was also in contact with "Saifullah." "Saifullah" provided guidance on how to travel in Pakistan in a manner that would not arouse suspicion. After his early on-line communications with "Saifullah," Minni successfully solicited the other four defendants to join him in traveling overseas.

One of the hallmarks of this conspiracy was its extreme secrecy. At the time of their departures, all five defendants were seemingly living quietly in northern Virginia and going to school. Yet, from approximately late-summer 2009 until December 2009, these defendants managed to make numerous preparations for their trip without arousing the suspicion of anyone. Not their families. Not their friends. Not their classmates. And not law enforcement.

They obtained visas, airline tickets, and got immunizations required for entry into Pakistan. They had many of these travel documents sent to a friend's house to avoid having them sent to their homes where they might be found out. They obtained money for the trip, sometimes using student loan money, or even taking money from their families without telling

---

[1] "Saifullah" was, in fact, an American citizen named Jude Kenan Mohammad who was living in the region around the borders of Pakistan and Afghanistan. Mohammed was charged in a sealed indictment in the Eastern District of North Carolina for conspiring to provide material support to terrorism. This indictment was unsealed in August 2009. In approximately November 2011, Mohammad was killed in a drone strike in Pakistan.

them.  Prior to their departure, Minni and Zamzam produced a video which they called a "Final Message."  Zamzam was the only speaker in the video, and he claimed that when Muslim lands are invaded, physical *jihad* against the disbelievers becomes obligatory.  This video was saved onto a USB drive which was given to Yemer's brother so that he could share it with the defendants' families after their departures.

On November 28, 2009, Minni, Yemer, and Chaudhry departed Dulles International Airport for Heathrow Airport in London, England, with a final destination of Pakistan. The following day, Khan and Zamzam departed Dulles on flights with the same destinations.  After his departure, Zamzam was contacted by a friend on his cell phone.  Zamzam acknowledged at that point that he and the other defendants were overseas.  He also told this individual that he would never see Zamzam again.

Once in Pakistan, the defendants established email accounts in order to be able to communicate while they traveled separately in two groups.  They also purchased two cellular telephones in Pakistan to assist in communicating.  Minni made multiple attempts on-line to contact "Saifullah" to set up a meeting with "Saifullah" and his "brothers."

By December 9, 2009, all five defendants had traveled to Sarhodha, Pakistan, with a plan of soon making it in Afghanistan.  That same day, all five defendants were in a house in Sargodha that belonged to Chaudhry's family.  Minni spoke briefly to "Saifullah" by telephone from that house, and shortly thereafter, the police entered the home and placed all five defendants under arrest.  Not long thereafter, they were all charged in Pakistan with terrorism-related offenses.

    A.    **United States' Efforts to Obtain Custody of all Five Defendants**

Almost immediately after the defendants' arrests, the FBI sent a team of agents to

Pakistan to attempt to interview the defendants. The Assistant Legal Attache (ALAT)[2] in Pakistan conducted several of his own interviews beginning on December 10, 2009, before the U.S.-based FBI agents arrived in Pakistan. From December 10, 2009, through December 19, 2009, the FBI team conducted a total of nine interviews of the defendants in Pakistan. Throughout these FBI contacts, Defendants Zamzam and Yemer both refused to speak to the FBI. Defendant Chaudhry largely refused as well, though at one point he did make a few pertinent admissions. Defendants Minni and Khan both spoke to the FBI, and made numerous admissions. They were each interviewed twice by the FBI team following that initial interview by the ALAT.

On December 23, 2009, the United States Attorney's Office for the Eastern District of Virginia filed the criminal complaint in this matter [Dkt. # 1]. The following day, on December 24, 2009, the government filed a motion and proposed order seeking a limited unsealing order so that "summary information as to the defendants' offense conduct could be taken from the complaint and supporting affidavit and provided to INTERPOL, as required for issuance of a Red Notice/Wanted Person Diffusion Alerts with respect to the warrants issued by the Court for the defendants' arrest" [Dkt. # 6, 7]. An INTERPOL Red Notice is an international notification to all country members of INTERPOL (which includes Pakistan) that the defendants were wanted in the United States on a criminal complaint, and that the United States government has made a firm commitment to seek the defendants' extradition.

On December 30, 2009, the United States Attorney's Office was notified via email that the Red Notice applications had been approved for all five defendants. [Attachment 1]. That email made clear that the purpose of the Red Notice was to seek extradition, "NOTE: As previously

---

[2] An Assistant Legal Attache is an FBI employee stationed in a foreign country, typically for several years, to act as an FBI liaison in that country.

noted, the Red Notice is a firm commitment by your office, and by the United States to request this fugitive's extradition in all but the most exceptional circumstances." [Attachment 1 at p. 2]. The Red Notice package appended to this email then listed the identity particulars of each of the five defendants charged in this case, and under the heading "Action to be taken if traced," stated for each defendant, "**Locate and arrest with a view to extradition.** Assurances are given that extradition will be sought upon arrest of the person, in conformity with national laws and/or the applicable bilateral and multilateral treaties." [Emphasis in the original].

On December 31, 2009, the government filed a second motion for a limited unsealing order so that "summary information as to the defendants' offense conduct can be taken from the complaint and supporting affidavit and used in a formal request from the United States Government to the Government of Pakistan, requesting the deportation or expulsion of the defendants from Pakistan." [Dkt. # 8, 9]. The motion was granted, and on January 15, 2010, a diplomatic note from the United States Embassy was sent to the Ministry of Foreign Affairs in Pakistan seeking the "transfer, by deportation, expulsion, or other lawful means," of the five defendants to face charges in the United States. [Attachment 2, at page 1]. In support of this request, the United States noted:

> Given the seriousness of the charges these individuals are facing in the United States, as well as the fact that most of their alleged criminal conduct took place in the United States, the United States believes that the transfer of the defendants now rather than at the conclusion of any proceedings in Pakistan would serve both our Governments' interests in this matter in combating terrorism more broadly.

[Attachment 2 at p. 2]. The Diplomatic Note went on to request that the Pakistani government "consider suspending or otherwise deferring its criminal proceedings against the defendants and deporting or expelling them as soon as possible to the United States." [Attachment 2 at p. 3].

  B.  **The Pakistani Prosecution**

5

Despite the diligent efforts of the United States government, the Pakistani government refused to turn the defendants over.  This was fully consistent with the bilateral treaty with Pakistan which specifically states that "[i]f the person claimed should be under examination or under punishment in the territories of the High Contracting Party applied to for any other crime or offence, his extradition *shall be deferred* until the conclusion of the trial and the full execution of any punishment awarded to him."  [Attachment 3, Pakistani Extradition Treaty, Article 4, Emphasis added].  That is precisely what occurred in this case.  At the time that the United States government first sought their transfer by deportation or expulsion, all five defendants were in custody in Pakistan awaiting trial.

Pakistan proceeded with that trial expeditiously.  Within seven months of their arrest, all five defendants were found guilty of various charges in Pakistan following a trial. The judgment of the District and Sessions Judge of the Anti-Terrorism Court in Sargodha, Pakistan ("Pakistani Judgment"), dated June 24, 2010, is Attachment 1 to Defendant Aman Yemer's Motion for Emergency Relief and For a Hearing [Dkt. # 29].  That written judgment is 52-pages long, and it describes much of what occurred in the trial.

C.      **The Pakistani Convictions**

On June 24, 2010, all five defendants were convicted of terrorism offenses in Pakistan and sentenced to ten years imprisonment.  Pakistani Judgment at P. 52.  Consistent with Pakistan's bilateral treaty, they were required to serve out the entirety of their sentences in Pakistan.  On June 22, 2020, via a Diplomatic Note, the United States government was informed that those sentences had ended on January 3, 2020, subject to the payment of fines. [Attachment 4].  In that Diplomatic Note, the Pakistani government requested that the U.S. government arrange for travel documents and air transportation so that defendants Zamzam, Yemer and

Minni could be deported back to the United States.[3]  The U.S. government promptly did so.  Yet despite those efforts, defendants Minni, Zamzam and Yemer, who did not have dual Pakistani citizenship, remained in prison for over two more years.  On approximately September 7, 2022, they were finally turned over to the FBI in Pakistan and deported back to the United States.  Their total time in prison was approximately 12 years and 9 months.

III.   **SENTENCING GUIDELINES**

In accordance with the Plea Agreement entered in this case, the government agrees that the following provisions of the Guidelines apply:

- The Base Offense Level is 26 pursuant to U.S.S.G. § 2M5.3(a).

- A 12-level enhancement applies pursuant to U.S.S.G. § 3A1.4(a) because the offense of conviction is a felony that involved, or was intended to promote, a federal crime of terrorism.

Also, pursuant to Section 3E1.1(b), the government moves the Court to grant the defendant an additional one-level reduction in the offense level for acceptance of responsibility, in addition to the two-levels provided in 3E1.1(a).  Factoring in these reductions, the parties believe that the Guidelines will properly be calculated as a level 35 and Criminal History Category VI, leading to an advisory Guideline range of 292-365 months in prison.  However, the statutory maximum penalty for this offense in 2009 was 15 years in prison.

IV.   **A VERY SHORT PERIOD OF IMPRISONMENT FOLLOWED BY A LENGTHY PERIOD OF SUPERVISED RELEASE IS WARRANTED IN THIS CASE UNDER THE SECTION 3553(a) SENTENCING FACTORS**

After calculating the appropriate advisory Guidelines range, a sentencing court must "determine whether a sentence within that range . . . serves the factors set forth in § 3553(a) and,

---

[3] This Diplomatic Note also addressed Chaudhry and Khan who were dual Pakistani citizens.  In their case, the Pakistanis requested an extradition request which the U.S. government promptly provided. As of the date of this pleading, they remain in Pakistan subject to extradition.

if not, select a sentence [within statutory limits] that does serve those factors." *United States v. Green*, 436 F.3d 449, 456 (4th Cir. 2006). Section 3553(a)(1) provides that, in determining a sentence, courts must consider the nature and circumstances of the offense, as well as the history and characteristics of the defendant.[4] Additional factors set forth in § 3553(a)(2) include the need for the sentence to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; to afford adequate deterrence to criminal conduct; to protect the public from further crimes of the defendant; and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.[5]

As described more fully herein, based on the particular facts and circumstances of this case, including the deterrent impact of the defendants' imprisonment in Pakistan, a short period of

---

[4] Courts have routinely noted that this statutory command requires the consideration of uncharged conduct about the defendant's past actions. *See, e.g.*, *Pepper v. United States*, 562 U.S. 476, 488 (2011) (a sentencing court is permitted to "consider the widest possible breadth of information about a defendant"); *United States v. Elbaz*, 39 F.4th 214, 229 (4th Cir. 2022) (same); *United States v. Brown*, 816 F. App'x 240, 247 (11th Cir. 2020) (noting that the district court "was required to consider what [the government] learned about [the defendant's] past conduct, even if uncharged, as part of the 'nature and circumstances' of the charged conduct and [the defendant's] 'history and characteristics'"); *United States v. Chavez-Calderon*, 494 F.3d 1266, 1270 (10th Cir. 2007) ("The sentencing court is well within its discretion and, indeed, is required to carefully consider the facts contained in the PSR when evaluating the § 3553(a) sentencing factors, including the history and characteristics of the defendant . . . ." (quoting *United States v. Mateo*, 471 F.3d 1162, 1167 (10th Cir. 2006)).

[5] Title 18, United States Code § 3583(c) sets forth a number of factors to be considered in including a term of supervised release, which closely mirror the 3553(a) sentencing factors. Specially, that statute indicates that if a term of supervised release is to be considered, the court "**shall consider** the factors set forth in section 3553(a)(1), (a)(2)(B), (a)(2)(C), (a)(2)(D)…" [Emphasis added]. Based on a careful consideration of those factors, as set forth herein, the government is seeking 20 years of supervised release, after arguing for a sentence of imprisonment just long enough to trigger that term of supervised release.

8

imprisonment followed by a 20-year term of supervised release serves the factors set forth in section 3553(a).[6]

## A. The Government Requests a Below-Guidelines Sentence

---

[6] To be clear, this is not to say that the defendants should receive *credit* for the time that they served in Pakistani prison, since that would mean they were getting credit for a foreign sentence in a foreign country. The statute governing computation of custody credit for federal sentences is 18 U.S.C. § 3585. Under this section, it is the Attorney General, acting through the BOP—not the district court—who has authority to compute custody credits. *United States v. Wilson*, 503 U.S. 329, 333-35 (1992) ("[Section] 3585(b) does not authorize a district court to compute the [presentence detention] credit at sentencing."); *United States v. Peters*, 470 F.3d 907, 909 (9th Cir. 2006) ("[T]he prerogative to grant credits in the first instance rests with the Attorney General, acting through the Bureau of Prisons."); *United States v. Martinez*, 837 F.2d 861, 865–66 (9th Cir. 1988) (citing *United States v. Clayton*, 588 F.2d 1288, 1292 (9th Cir. 1979)) ("It is the administrative responsibility of the Attorney General, then Department of Justice, and the Bureau of Prisons to compute sentences and apply credit where it is due. It is not the province of the sentencing court."). Because the computation of custody credit is an executive function and not a judicial one, federal prisoners must exhaust all administrative remedies through the BOP before seeking judicial relief.[2] And the exhaustion requirement is jurisdictional. *United States v. Lucas*, 898 F.2d 1554, 1556 (11th Cir. 1990). More importantly, under § 3585(b)(2), federal prisoners may not receive credit for prior custody against their federal sentences if that time has been previously credited against another sentence—including a foreign sentence. *See Ezeobi v. Fairton*, 782 Fed. Appx. 106, 107 (3rd Cir. 2019) (defendant who was incarcerated in U.K. and who received credit against his U.K. sentence before being deported to the U.S. was not entitled to custody credit under 18 U.S.C.S. § 3585(b)(2)); *Comrie v. Wilner*, 380 Fed. Appx. 783, 785 (10th Cir. 2010) (federal prisoner not entitled to credit under § 3585(b) because the prisoner's prior time in custody was credited to his state sentence). As the Tenth Circuit has explained, a defendant isn't entitled to "double credit" when he "owe[s] a debt to two separate sovereigns" because each "ha[s] a right to exact its debt independently of the other." *Goode v. McCune*, 543 F.2d 751, 753 (10th Cir. 1976). Additionally, § 3585 (b)(1) specifies that credit for prior custody shall only be given in connection with "the offense for which the sentence was imposed," i.e., a federal sentence imposed by a United States District Court. Federal appellate case law has long held that even when the identical criminal "acts" formed the basis for both a federal offense and a foreign offense, a prisoner is not entitled to credit against a federal sentence for time spent serving a prior foreign sentence. *Jackson v. Brennan*, 924 F.2d 725, 728 (7th Cir. 1991) (applying the predecessor to 18 U.S.C. § 3585 and concluding defendant was not entitled to credit for incarceration in Cuba for related conduct; credit is due "only when the pre-sentence custody is federal custody or non-federal custody that was caused or sustained by the federal government"); *see also Kendrick v. Carlson*, 995 F.2d 1440, 1445–46 (8th Cir. 1993) (no credit for incarceration in the Netherlands for related conduct); *Marks v. Clark*, 61 F.3d 906, 906 (7th Cir. 1995) (federal inmate's prior custody for violating U.K. law was not creditable toward his federal sentence pursuant to 18 U.S.C. § 3585(b)).

Given the unique facts of this case, the government is not seeking a sentence within the Guidelines. To the contrary, the government is asking the Court to impose a very short term of imprisonment through a downward departure or a variance, followed by a lengthy term of supervised release. USSG §1B1.4 provides that, "[i]n determining the sentence to impose within the guideline range, **or whether a departure from the guidelines is warranted**, the court may consider, without limitation, any information concerning the background, character and conduct of the defendant, unless otherwise prohibited by law. *See*, 18 USC §3661." (Emphasis added). The Commentary to §1B1.4 notes that "Congress intended that no limitation would be placed on the information that a court may consider in imposing an appropriate sentence."

The 18 U.S.C. § 3553(a) factors support the recommended sentence in this particular case. As stated above, based on the particular facts and circumstances of this case, it is the government's position that the time already spent in Pakistani custody serves as adequate deterrence to future criminal conduct. Coupled with the lengthy term of supervised release that the government and the defense are jointly seeking, this serves to protect the public from further criminal activity by these particular defendants. Consequently, considering the 3553(a) factors, a sentence of this nature, while unique, is "sufficient, but not greater than necessary" to achieve the purposes of 18 U.S.C. § 3553(a).

  B.  **The Appropriate Sentence in this Case**

While the government is not seeking a substantial term of imprisonment in this case, it is clear that *some* term of imprisonment must be imposed in order to trigger the Court's ability to impose a term of supervised release. Title 18 U.S.C. 3583(a) authorizes a term of supervised release by saying, "The court, **in imposing a sentence to a term of imprisonment for a felony** or a misdemeanor, may include as a part of the sentence a requirement that the defendant be

placed on a term of supervised release after imprisonment. . . ." [Emphasis added]. Here, the government would simply ask the Court to impose a sentence of imprisonment of one day and to credit the time that the defendants spent detained at the Alexandria Detention Center on or about September 7, 2022. This would satisfy the requirement that the defendants be sentenced to a term of imprisonment, and would allow this Court to impose a period of 20 years of supervised release, which is appropriate in this case for the reasons explained below.

V.  **THE 18 USC 3553(a) FACTORS WARRANT 20 YEARS OF SUPERVISED RELEASE**

The parties have jointly recommended in the plea agreement a term of 20 years of supervised release. For the following reasons, after factoring in the relevant 3553(a) factors, this is the appropriate sentence in this case.

  A.  **The Nature and Circumstances of the Offense and the History and Characteristics of the Defendant (18 USC 3553(a)(1))**

There is no doubt that this is a serious offense. Crimes of terrorism are undoubtedly serious offenses, and here the defendants conspired to travel abroad in order to fight against American troops in Afghanistan. Before leaving on this trip, defendants Minni and Zamzam produced a video that they titled "A Final Message" to explain the reasons why they were doing what they were doing. In short, they claimed that it was obligatory for them to travel overseas to fight in *jihad* to defend their fellow Muslims.

It is indicative of how seriously they took this obligation that these five defendants were able to make a trip like this undetected. They employed very good operational security and were very disciplined, allowing them to conceal their plans from their closest friends and family.

And while these defendants were not involved in any sort of criminal activity prior to this trip, that is a factor that should weigh in favor of a lengthy term of supervised release, not against

11

it.  Despite stable family lives, great educational opportunities, and promising futures, these defendants chose to embark upon a dangerous, and potentially violent path.  It is very likely that the only thing that stopped their planned acts of violence was their prompt arrest by the Pakistani authorities.

Now, having served out those Pakistani sentences, the defendants are back in the community where they first hatched this conspiracy.  Without some period of incarceration here in the United States, it is certainly appropriate to have them supervised by the Probation Office as they transition back into the civilian world.  Doing so will help to protect the community and will ensure that the defendants remain vigilant about staying out of any further trouble.

    **B.**    **To Reflect the Seriousness of the Offense, To Promote Respect for the Law, and to Provide Just Punishment (18 USC 3553(a)(2)(A))**

As noted above, this is a serious offense.  A sentence of 20 years of supervised release helps to reflect that fact.  It also promotes respect for the law.  During their time of supervised release, the defendants will be in regular contact with experienced U.S. Probation Officers who can stress the importance of adhering to the law and being productive members of society.

A 20-year supervised release term will also provide just punishment.  While it is admittedly not equivalent to imprisonment, in this case it is the appropriate punishment in light of the unique circumstances outlined above.  Such a sentence makes the point that the defendants are not entirely free and clear after returning to the United States.  They will be required to live law-abiding lives while being required to strictly adhere to specific supervised release conditions that will ensure proper oversight and compliance.

    **C.**    **To Afford Adequate Deterrence to Criminal Conduct (18 USC 3553(a)(2)(B))**

A sentence of 20 years supervised release provides adequate deterrence to criminal conduct.  At the time that these defendants traveled to Pakistan, this case garnered a great deal of

media attention, both here and around the world.[7] Since they have returned, the media has continued to follow this case. A sentence of 20-years of supervised release will demonstrate that the government views these offenses very seriously, and anyone contemplating similar conduct will face severe consequences. While it is the government's position that the time already spent in Pakistani custody serves as adequate deterrence to future criminal conduct, the defendants will need to comply with supervised release conditions or find themselves subject to additional imprisonment in the future.

### D. To Provide the Defendants with Needed Educational or Vocational Training, Medical Care or Other Correctional Treatment in the Most Effective Manner

A sentence of 20-years supervised release helps to achieve these objectives. While the defendants will not be under confinement where they will receive educational or vocational training, they will be subject to supervision by the Probation Office. They will need to make efforts to work or go to school. They will need to meet on a regular basis with a Probation Officer who can keep tabs on, and encourage, their continued progress. And they will have the benefit of an experienced Probation Officer who can help smooth the transition back to life in the United States.

### CONCLUSION

For all of the foregoing reasons, the government intends to recommend a sentence of imprisonment of one day, with credit for time served on or about September 7, 2022, followed by a jointly recommended term of supervised release of 20 years.

---

[7] *See e.g.*, "Mosque of Americans arrested in Pakistan plans investigation." https://www.cnn.com/2009/WORLD/asiapcf/12/11/pakistan.arrests/index.html; "5 Americans Get 10-Year Sentences in Pakistan Terror Plot." https://abcnews.go.com/Blotter/americans-convicted-terrorism-pakistan/story;

Respectfully submitted,

Jessica D. Aber
United States Attorney

By:    /s/   John T. Gibbs
John T. Gibbs
Assistant United States Attorney
United States Attorney's Office for the
Eastern District of Virginia
2100 Jamieson Avenue
Alexandria, Virginia 22314
703-299-3700

14

**CERTIFICATE OF SERVICE**

      I hereby certify that on April 21, 2023, I electronically filed this motion with the Clerk of Court using the CM/ECF system, which will transmit a Notice of Electronic Filing to all counsel of record in this case.

                                              /s/   John T. Gibbs
                                              John T. Gibbs
                                              Assistant United States Attorney
                                              United States Attorney's Office for the
                                              Eastern District of Virginia
                                              2100 Jamieson Avenue
                                              Alexandria, Virginia 22314
                                              703-299-3700